Allen Patatanyan (State Bar No. 210586)
    *allen@westcoasttriallawyers.com*
Neama Rahmani (State Bar No. 223819)
    *nr@westcoasttriallawyers.com*
Ronald L. Zambrano (State Bar No. 255613)
    *ron@westcoasttriallawyers.com*
Melineh Kasbarian (State Bar No. 329033)
    *melineh@westcoasttriallawyers.com*
WEST COAST EMPLOYMENT LAWYERS, APLC
350 South Grand Avenue, Suite 3325
Los Angeles, California 90071
Telephone: (213) 927-3700
Facsimile: (213) 927-3701
*efilings@westcoasttriallawyers.com*

Attorneys for Plaintiffs, JERICHO
NICOLAS, et al. and Other Similarly
Situated and Aggrieved Employees

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERICHO NICOLAS an individual, et al., On Behalf of Themselves and All Others Similarly Situated and Aggrieved;<br><br>            Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC, a Delaware Corporation; and DOES 1 through 10,<br><br>            Defendants. | CASE NO.: 4:19-cv-08228-PJH<br><br>**CLASS ACTION  —SECOND THIRD AMENDED COMPLAINT FOR DAMAGES, PENALTIES, ATTORNEYS FEES, AND INJUNCTIVE RELIEF FOR, *INTER ALIA*, LABOR CODE WAGE AND HOUR VIOLATIONS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jericho Nicolas, Juan Montalvo, Gary Baumgarten, Christine Tringali, Carlos Alvarez, Rick Anderson, Kamal Suri, Jorge Jimenez, Jaime Del Real, Lisette Castillo, Benjamin Laney, Kelly Clifton, Eric Calvillo Hernandez, Steven Robert Callahan, Juan Jamarron, , Richard Trujillo, Marcos Montes, Barton Lasheem, Dora Waters, , Rolando Vega, Shamar Drew, Zuleyma Torres, Sevak Vartanpour, Claudia Duque, Timothy Kershaw, Kevin Byler, Yhon Lara, Royal Gaston, Majd Iskandafi, Alexi Vinnik, , Bryant Castaneda, Christine Economos, Carlos Torres, Christopher Campana, Gustavo Candelo, James Sparks, Jason Casas, Jose Contreras, Juan Castro, Kamal Suri, Karen Y. Alvarez, Syed Naqvi, Wayne Merritt, Williams Ramirez, Laura Alvarado Hernandez, Sherif Bebawy, on behalf of themselves only (collectively referred herein as "Non-Representative Plaintiffs") and Mark Glinoga, Kevin Neely and Alexis Gonzalez (Glinoga, Neely and Gonzalez shall be, from time to time, collectively referred to as "Plaintiffs") on behalf of themselves and acting for the interests of other current and former employees, allege as follows:

## NATURE OF THE ACTION

1.     This is a wage and hour class action pursuant to California Code of Civil Procedure § 382, on behalf of Plaintiffs and all individuals working or having worked as "ride-share drivers" ("Class Members") for Defendant UBER TECHNOLOGIES, INC., (hereinafter "UBER" or "DEFENDANT EMPLOYER") within the State of California.  The Non-Representative Plaintiffs seek a remedy for their respective individual claims only and will pursue those claims through arbitration.

2.     Plaintiffs are informed and believe and, based thereon allege, that the Class Members consist of approximately 50,000-75,000 current and former UBER employees who worked as UBER "ride-share drivers" and who opted out of the arbitration provision.

//

3.     From at least April 2018, when the *Dynamex* decision was issued by the California Supreme Court, and continuing to the present, and pursuant to company policy and/or practice and/or direction, UBER failed to pay Plaintiffs and other Class Members minimum wage and/or overtime, and UBER did not reimburse for work-related expenses, such as mileage and cell phone usage.

4.     From at least April 2018 and continuing to the present, and pursuant to company policy and/or practice and/or direction, UBER intentionally misclassified Plaintiffs and other Class Members as independent contractors when they were employees under the law.

5.     From at least April 2018 and continuing to the present, and pursuant to company policy and/or practice and/or direction, for certain Plaintiffs and other Class Members, UBER failed to: (1) provide final paychecks immediately upon involuntary termination or within 72 hours of voluntary separation; (2) pay final wages at the location of employment; and (3) include all wages due in the final paychecks.

6.     Plaintiffs, on behalf of themselves and all Class Members, bring this action pursuant to California Labor Code §§ 201, 203, 226, 226.8, 510, 1197, 2082, 2750.3, 2698 et seq., 2998 et seq., California Code of Regulations, Title 8, § 11050, and Industrial Welfare Commission Wage Order No. 4, for unpaid wages, penalties, injunctive and other equitable relief, and reasonable attorneys' fees and costs.

7.     Plaintiffs, on behalf of themselves and all Class Members, pursuant to Business & Professions Code §§ 17200-17208, also seek injunctive relief, restitution, and other available relief for the violations alleged in this Complaint.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 et. seq.  This action arises under the Class Action Fairness Act ("CAFA") because at least one Class Member is a citizen of a different

state than the Defendants, the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and none of the exceptions of the CAFA apply. Furthermore, jurisdiction is proper in this Court because the amount in controversy exceeds $75,000.00, exclusive of interests and costs, and the dispute is between citizens of different States.

9.     This Court has personal jurisdiction over UBER because UBER conducts business in California, is headquartered in California, and because the events or transactions giving rise to this action occurred within California.

10.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the U.S. District Court for the Northern District of California because UBER maintains its headquarters in the City of San Francisco, County of San Francisco, and UBER conducts significant business in this District.

<u>**PARTIES**</u>

11.     The named Plaintiffs and Non-Representative Plaintiffs Jericho Nicolas, Juan Montalvo, Gary Baumgarten, Christine Tringali, Carlos Alvarez, Rick Anderson, Kamal Suri, Jorge Jimenez, Jaime Del Real, Lisette Castillo, Benjamin Laney, Kelly Clifton, Eric Calvillo Hernandez, Steven Robert Callahan, Juan Jamarron, Mark Glinoga, Richard Trujillo, Marcos Montes, Barton Lasheem, Dora Waters, Kevin Neely, Rolando Vega, Shamar Drew, Zuleyma Torres, Sevak Vartanpour, Claudia Duque, Timothy Kershaw, Kevin Byler, Yhon Lara, Royal Gaston, Majd Iskandafi, Alexi Vinnik, Alexis Gonzalez, Bryant Castaneda, Christine Economos, Carlos Torres, Christopher Campana, Gustavo Candelo, James Sparks, Jason Casas, Jose Contreras, Juan Castro, Kamal Suri, Karen Y. Alvarez, Syed Naqvi, Wayne Merritt, Williams Ramirez, Laura Alvarado Hernandez, Sherif Bebawy are each a natural person and a citizen of the State of California.

12.     Defendant UBER TECHNOLOGIES, INC. (hereinafter "UBER" or "DEFENDANT EMPLOYER") is, and at all times herein mentioned, was a

1  Delaware corporation, with the capacity to sue and to be sued, and doing business,
2  with the same principal place of business located at 1455 Market Street, #400, San
3  Francisco, California 94103.

4      13.    The true names and capacities of the Defendants named herein as
5  DOES 1 through 10, inclusive, whether individual, corporate, partnership,
6  association, or otherwise, are unknown to Plaintiffs who therefore sue these
7  Defendants by such fictitious names.  Plaintiffs will request leave of court to amend
8  this Complaint to allege their true names and capacities at such time as they are
9  ascertained.

10     14.    Plaintiffs are informed and believe and, thereon allege, that each of the
11  Defendants herein were at all times the agent, employee, or representative of each
12  remaining Defendant and were at all times herein acting within the scope and
13  purpose of said agency and employment.  Plaintiffs further allege that as to each
14  Defendant, whether named or referred to as a fictitious name, supervised, ratified,
15  controlled, acquiesced in, adopted, directed, substantially participated in, and/or
16  approved the acts, errors, or omissions, of each remaining Defendant.

17                          **GENERAL ALLEGATIONS**

18     15.    Defendant UBER developed and maintains a technology platform that
19  connects riders with ride-share drivers, such as Plaintiffs and all Class Members
20  herein, through an application on their respective mobile devices.

21     16.    UBER charges the rider a fee and uses a portion of the money collected
22  from the rider to pay Plaintiffs and all Class Members herein.

23     17.    UBER's business model is inextricably linked to the work of Plaintiffs
24  and all Class Members herein transporting the riders, as UBER collects money from
25  a rider after the rider utilizes a Plaintiff or Class member through UBER's
26  application.

27     18.    Without the Class Members' work in transporting paying-riders,
28  UBER would not exist as it is known today.

CLASS ACTION –SECOND AMENDED COMPLAINT FOR DAMAGES AGAINST UBER
4

19.     Since the inception of UBER's ride-sharing service, Class Members have been treated as independent contractors so that they are not entitled to any of the protections an employee would have under California law.

20.     In April 2018, the California Supreme Court, in the now-infamous *Dynamex* decision, ruled that companies must successfully meet the three prong "ABC" test in order to lawfully classify someone as an independent contractor for purposes of Wage Order claims. *Dynamex Operations West v. Superior Court,* 4 Cal.5th 903 (2018); see also *Garcia v. Border Transportation Group, LLC*, 28 Cal. App. 5th 558 (2018). The ABC test requires an employer to prove the following to justify "independent contractor" classification: (A) the worker is free from the control and direction of the hiring entity in the performance of the work, both under the contract for the performance of the work and in fact; (B) the worker performs work that is outside the usual course of the hiring entity's business; and (C) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity. *See Dynamex*, at 958-963.

21.     On September 18, 2019, California Governor Gavin Newsom signed Assembly Bill 5 ("AB5"), commonly referred to as the "gig worker law." AB5 codified *Dynamex*'s ABC Test under the soon-to-be-added Labor Code § 2750.3, creating a rebuttable presumption that a worker is an employee unless the test is met, and explicitly exempted certain trades and professions. Neither the Class Members or ride-share companies, like UBER, were exempted under AB5.[1]

22.     Leading up to AB5's passage, UBER declared it would continue to treat its drivers, like Plaintiffs and Class Members herein, as independent

---

[1] California Legislature, *Assembly Bill 5: employees and independent contractors*, "Today's Law As Amended." https://leginfo.legislature.ca.gov/faces/billCompareClient. xhtml?bill_id=201920200AB5 (accessed Oct. 31, 2019).

contractors after AB5 becomes law: "just because the [ABC] test is hard does not mean [UBER] will not be able to pass it."[2]

23.     Since the April 2018 *Dynamex* decision, and after not being exempt from AB5, UBER continues and will continue to treat Plaintiffs and Class Members as independent contractors despite UBER's inability to meet the ABC test.

*PLAINITFFS AND CLASS MEMBERS ARE UBER'S EMPLOYEES*

24.     **Plaintiffs Are Not Free of the Control & Direction of UBER in the Performance of Work.**

25.     For all relevant times, without any input from Class Members, UBER controls and directs the terms and conditions of the Class Members work equipment, work environment, the way work is performed, and the manner in which drivers behave towards riders.

26.     For all relevant times, UBER controls and directs the performance of work of Class Members by way of minimum vehicle requirements for vehicles a driver can utilize before allowing access to riders through its application. Specifically, UBER has the following vehicle requirements:

- 15-year-old vehicle or newer
- 4-door vehicle
- Good condition with no cosmetic damage
- No commercial branding
- Pass a vehicle inspection.[3]

27.     For all relevant times, UBER controls and directs the performance of work of Class Members by way of minimum cosmetic guidelines for vehicles a

---

[2] Uber Newsroom, "Update on AB5," Sept. 12, 2019, https://www.uber.com/newsroom/ab5-update/ (accessed Oct. 31, 2019).

[3] "Vehicle Requirements," https://www.uber.com/drive/los-angeles/vehicle-requirements/ (accessed Oct. 30, 2019.)

ride-share driver can utilize before allowing access to riders through its application.  Specifically, UBER prohibits:

- Full-body wraps containing advertisements, or any large ads
- Holes in exterior
- Taxi decals or taxi-style paint
- Significant damage to interior (torn seats, large permanent stains, strong permanent odors)
- Paint Oxidation
- Different colored hoods/doors
- Aftermarket modifications
- Window tinting must be within acceptable California regulations.[4]

28.    For all relevant times, UBER  controls and directs the performance of work by determining the minimum experience for Class Members in that they all must "meet the minimum age to drive in [their] city; [and] [h]ave at least one year of licensed driving experience in the US (3 years if you are under 23 years old)."[5]

29.    For all relevant times, UBER controls and directs the performance of work of Class Members by requiring successfully passing a background check.[6] Upon information and belief, UBER will not allow a driver to work as its ride-share driver if the background check reveals either of the following: (1) any major moving violations within the last seven years; (2) more than three minor moving violations in the last three years; or (3) a criminal conviction within the last seven years for a felony, violent crime, or sexual offense.[7]

---

[4]  *Id.*
[5]  "Driver Requirements,' https://www.uber.com/us/en/drive/requirements/
[6]  *Id.*
[7]  "What Disqualifies Drivers During an Uber Background Check," https://www.ridester.com/uber-background-check/ (accessed Oct. 31, 2019.)

30.     For all relevant times, UBER controls and directs the performance of work of ride-share drivers by requiring a vehicle used by a Class Member to have a certain level of cleanliness.[8]

31.     For all relevant times, UBER controls and directs the performance of work of Class Members by setting limits on how long a ride-share driver can drive as an UBER driver before UBER will have the application go "offline" for a driver.[9]

32.     For all relevant times, UBER controls and directs the performance of work of ride-share drivers by requiring its drivers to provide a 5-star experience by maintaining high standards of quality that can be taught by UBER approved services.[10]

33.     **Plaintiffs Do Not Perform Work Outside the Usual Course of UBER's Business.**

34.     For all relevant times, UBER's usual course of business is the transportation of people.  In UBER's own words:

> What started as a way to tap a button to get a ride has led to billions of moments of human connection as people around the world go all kinds of places in all kinds of ways with the help of our technology . . . ***Transportation isn't the only thing we're changing*** through our technology.[11]  On-demand transportation technology is our core service, and the app that

---

[8] "Keeping Your Vehicle Clean," https://help.uber.com/partners/article/keeping-your-vehicle-clean?nodeId=39695c4b-aafa-443a-a99f-1567d7215db6. (accessed Oct. 31, 2019.)
[9] "Driver Time," https://help.uber.com/partners/article/driving-time?nodeId=c8785b5d-e2eb-42be-8c99-000d111e06d0.  (accessed Oct. 31, 2019.)
[10] "Quality Improvement Courses," https://help.uber.com/partners/article/quality-improvement-courses?nodeId=9deed9cc-6221-43f8-b699-aaf0d0653569; "Understanding Ratings" https://help.uber.com/partners/article/understanding-ratings?nodeId=fa1eb77f-ad79-4607-9651-72b932be30b7 (accessed Oct. 31, 2019.)
[11] "About," https://www.uber.com/us/en/about/ accessed Oct. 31, 2019.)

connects driver-partners and riders is what makes it all
possible.[12]

35.     For all relevant times, Plaintiffs and all other Class Members work
within UBER's usual course of business of the transportation of people by driving
UBER's customers from place to place.

36.     **Plaintiffs Do Not Have an Independently Established Trade,
Occupation, or Business of Ride-Sharing.**

37.     For all relevant times, Plaintiffs and all other Class Members do not
provide ride-share services "independently" of their relationship with UBER.

38.     For all relevant times, Plaintiffs and all other Class Members report
their work done exclusively to UBER through the UBER phone application.

39.     For all relevant times, Plaintiffs and all other Class Members
managed no people.

40.     For all relevant times, Plaintiffs and Class Members are working for
UBER from the time they turn on the application to wait for a ride-share request up
until they turn off the application after the last drop off.

41.     For all relevant times, Plaintiffs and Class Members' duties as ride-
share drivers did not qualify them as exempt for purposes of the overtime law.

42.     For all relevant times, Plaintiffs and Class Members were entitled to
minimum wage for every hour they worked.

43.     For all relevant times, Plaintiffs and Class Members worked about 40
hours per week, sometimes more, sometimes less.

44.     For all relevant times, upon information and belief, Plaintiffs and Class
Members were not paid time and a half for any overtime they worked nor were they

---

[12] "How Uber Works," https://www.uber.com/us/en/about/how-does-uber-work/ (accessed Oct. 31, 2019.)

paid after the paycheck was due and were underpaid for the hours worked to the extent the pay did not meet the minimum wage requirements.

45.    Under California law, all wages must be paid twice during each calendar month as set forth in Labor Code § 204(a).

46.    Under California law, all nonexempt employees are entitled to time and a half for each hour worked in excess of 40 in a week and double time pay for hours worked over 12 in a day or for every hour after the first eight on the seventh day of work.

47.    Under California law, all employees must be paid at least the minimum wage for every hour worked.

48.    Under California law, employees must be reimbursed for business related expenses.

49.    For all relevant times, Plaintiffs and Class Members were not reimbursed for use of their cell phone in using the UBER application or for mileage they put on their vehicle while carrying out their duties for UBER.

50.    Under California law, all employers must provide wage statements listing twelve specific items as set forth in Labor Code § 226, including the accurate accounting of hours worked.

51.    For all relevant times, Plaintiffs and Class Members were underpaid for hours worked, even to the extent that UBER was not paying the minimum wage.

52.    For all relevant times, Plaintiffs and Class Members were not paid time and a half for all the overtime hours they worked on those periods they received wages late.

53.    For all relevant times, when Plaintiffs and Class Members were fired, UBER failed to provide unpaid wages or commissions in their last paycheck.

54.    To date, UBER has not paid Plaintiffs and Class Members all their wages due and payable to them, in an amount to be proven at trial.

## SPECIFIC ALLEGATIONS CONCERNING LABOR CODE VIOLATIONS

55. Since March 1, 2019, Plaintiffs Mark Glinoga (hereinafter "GLINOGA"), Alexis Gonzales (hereinafter "GONZALES"), and Kevin Neely ("hereinafter "NEELY") (Collectively referred to as "Plaintiffs"), have beenbegan working as UBER drivers by use of the UBER application, use of their own car, and with the use of their own money for maintenance of the vehicle and phone used to carry out their duties for UBER.

56. Specifically, GLINOGA, GONZALEZ and NEELY have used Defendant UBER's application since March 1, 2019 to provide the transportation service to UBER customers by turning on UBER's driver app and set the settings so that they can see and accept UBER customer requests for a ride through the UBER application.

57. In this manner, since March 1, 2019, GLINOGA, GONZALEZ and NEELY have had the application set to "on," waiting for an UBER customer request for long periods of time; often times spending more time waiting for a ride request than driving a customer resulting in the compensation for said ride or rides over the course of a week to come out to less than minimum wage per hour.

58. Also, since March 1, 2019, GLINOGA, GONZALEZ and NEELY regularly had the UBER application on, waiting for and providing for UBER customers for over 8 hours a day, after having done this function 40 hours in a week. In the instances where GLINOGA, GONZALEZ and NEELY earned enough to meet minimum wage for 40 hours of work in a week, they were not paid time and half for hours worked in excess of 40 hours in a week (i.e., over time pay of time and half).

59. Since March 1, 2019, in waiting for and providing rides for UBER customers while using UBER's application (as they cannot solicit UBER customers without UBER's permission under the terms and conditions imposed by UBER without this application)  GLINOGA, GONZALEZ and NEELY used their own

phone, paid for the cell phone service necessary to access UBER's application, drove their own car to carry out their duties as a UBER ride share driver in waiting for, picking up and driving UBER customers to their requested locations, and paid for gas and maintenance of their respective cars used in carrying out their duties and obligations for UBER.   Since March 1, 2019, the foregoing activities' costs in carrying out their ride-share/transportation function on UBER's behalf were borne respectively by GLINOGA, GONZALEZ and NEELY, none of which has been reimbursed by UBER to date.

## CLASS ACTION ALLEGATIONS

60.   Plaintiffs bring this action on behalf of themselves and all others similarly situated as a Class Action pursuant to FRCP Rule 23.  Plaintiffs seek to represent a class composed of and defined as follows: "All persons who worked as ride-share drivers for UBER (hereinafter referred to as "Ride-share drivers"), from March 1, 2019 to the present, who opted out of both the 2015 and 2019 arbitration provisions.

61.   Excluded from the class and class claims is any UBER employee or worker that did not work as a ride-share driver, as well as those that did not opt out of either the 2015 or 2019 arbitration agreements.  Excluded from the class include all named plaintiffs herein (Non-Representative Plaintiffs) but not Plaintiffs GLINOGA, GONZALEZ and NEELY.

62.   This action has been brought and may properly be maintained as a Class Action under FRCP 23 because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

**A.   Numerosity**

63.   The potential members of the Class as defined are so numerous or many that joinder of all the members of the Class is impracticable.  While the precise number of Class Members has not been determined at this time, Plaintiffs are informed and believe, and on that basis allege, that UBER currently employs,

1  and during the relevant time periods employed, over 50,000 Ride-share drivers.

2  **B.    Commonality**

3      64.    There are questions of law and fact common to the Class that

4  predominate over any questions affecting only individual Class Members.  These

5  common questions of law and fact include, without limitation and subject to

6  possible further amendment:

7          (a) Whether UBER intentionally misclassified the Class as

8              independent contractors after April 2018, in violation of

9              Labor Code § 226.8 and *Dynamex*;

10         (b) Whether Defendants' policy or practice of not paying

11             Plaintiffs overtime compensation for the hours they

12             worked over 40 in a workweek or eight hours in a day is

13             illegal under Labor Code §§ 510, 1194, and Wage Order

14             No. 4-2001 § 3(A);

15         (c) Whether Defendants' policy or practice of not paying ride-

16             share drivers all their wages due in their final paychecks

17             immediately upon involuntary termination or when 72

18             hours' notice was provided before voluntary resignation,

19             is unlawful under Labor Code §§ 201, 202 and/or 203;

20         (d) Whether Defendants' policy or practice of not paying ride-

21             share drivers of at least minimum wage is a violation of

22             Labor Code §§ 1194 and 1197;

23         (e) Whether Plaintiffs and the members of the Class are

24             entitled to equitable relief pursuant to Business &

25             Professions Code §§ 17200, et seq;

26         (f) Whether Defendants violated Labor Code §§ 226 by not

27             providing accurate pay stubs;

28         (g) Whether Defendants violated California law including but

CLASS ACTION –SECOND AMENDED COMPLAINT FOR DAMAGES AGAINST UBER
13

1   not limited to California Industrial Welfare Commission
2   ("IWC") Wage Order Nos. 4-2001, 4-2000, and 4-1998 by
3   not keeping accurate time records;

4   (h) Whether Plaintiffs and/or the Class Members are entitled
5   to injunctive relief;

6   (i) The nature and extent of class-wide injury and the
7   measure of damages, restitution penalties, or other
8   monetary relief owed; and

9   (j) Whether Defendants violated the Unfair Business
10   Practices Act (Bus. & Prof. § 17200) by violating the laws
11   alleged to have been violated in this Complaint.

**C.      Typicality**

65.    Plaintiffs' and all other Class Members' claims are typical of the claims of the Class.  Plaintiffs and all members of the Class sustained injuries and damages arising out of and caused by Defendants' common course of conduct and policies in violation of laws, regulations that have the force and effect of law and statutes as alleged herein.  Plaintiffs' and all other Class Members' claims are thereby representative of and co-extensive with the claims of the class.  Plaintiffs' and all other Class Members' claims are typical of the claims of the members of the Class because they were hourly-paid employees who, like the other members of the Class, sustained damages and losses arising out of the Defendants' unlawful conduct, which includes, but is not limited to, the following: repeatedly failing to pay – or indeed ever pay – hours reported worked; failing to provide accurate wage statements; failing to pay bi-monthly in a timely manner; failing to pay Plaintiffs and Class Members all wages due immediately upon involuntary termination; and failing to include all wages in said final paychecks.

**D.      Adequacy of Representation**

66.    Plaintiffs are members of the Class, do not have any conflicts of

interest with other Class Members, and will prosecute the case vigorously on behalf of the Class.  Counsel representing Plaintiffs are competent and experienced in litigating large employment class actions, including wage and overtime class actions.  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.

**E.**   **Superiority of Class Action**

67.   A class action is superior to other available means for the fair and efficient adjudication of this controversy; especially whether Class Members are misclassified as independent contractors under Labor Code § 2750.3's ABC test.  Individual joinder of all Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.  Each Class Member has been damaged or suffered injury and is entitled to recovery by reason of Defendants' illegal policies and/or practices including but not limited to failing to pay – or indeed ever pay -- overtime compensation to its employees;  failing to pay minimum wage; failing to provide accurate wage statements; and failing to pay Plaintiffs and Class Members all wages due immediately upon involuntary termination, within 72 hours of voluntary resignation, paying said final wages at the place of employment, and including all wages in said final paychecks.  Class Action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

68.   Class Action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude maintenance as a Class Action.

69.   Plaintiffs bring this action on behalf of themselves and on behalf of others similarly situated current employees and former employees, including but

not limited to all individuals "contracted," but legally employed, as "Ride-share drivers," pursuant to Code of Civil Procedure § 382 and as Class Claims.  The Class of employees that Plaintiffs seek to represent includes all individuals employed as a "Ride-share drivers":

      (a) Who were misclassified as independent contractors;

      (b) Who did not receive overtime compensation; and/or

      (c) Who did not receive minimum wages; and/or

      (d) Who did not receive payment of wages on a timely, bi-

         monthly manner; and/or

      (e) Who did not receive accurate wage statements; and/or

      (f) Who were not timely paid all wages owed upon

         involuntary termination, or within 72 hours of voluntary

         resignation, at the place of employment.

For the reasons alleged in this Complaint, this action should be certified as a Class Action.

### FIRST CAUSE OF ACTION

**(Individual and Representative Claim for**

**Failure to Pay Timely Earned Wages During Employment and**

**Upon Separation of Employment in Violation of**

**California Labor Code §§ 201, 202, 203, 204, 218.5, and 218.6)**

**(GLINOGA, GONZALEZ and NEELY Against All Defendants)**

70.  Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.

71.  Pursuant to Labor Code § 201, "if an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

72.  Pursuant to Labor Code § 202, "if an employee not having a written contract for a definite period quits his or her employment, his or her wages shall

1    become due and payable not later than 72 hours thereafter, unless the employee

2    has given 72 hours previous notice of his or her intention to quit, in which case the

3    employee is entitled to his or her wages at the time of quitting."

4        73.   Labor Code § 203 provides, in pertinent part: "If an employer willfully

5    fails to pay, without abatement or reduction, ... any wages of an employee who is

6    discharged or who quits, the wages of the employee shall continue as a penalty

7    from the due date thereof at the same rate until paid or until an action therefore is

8    commenced; but the wages shall not continue for more than 30 days. ..."

9        74.   Pursuant to Labor Code § 204, "all wages … earned by any person in

10   any employment are due and payable twice during each calendar month, on days

11   designated in advance by the employer as the regular paydays."

12       75.   Pursuant to Labor Code §§ 218.5 and 218.6, an action may be brought

13   for the nonpayment of wages and fringe benefits.

14       76.   Plaintiffs and Class Members were not properly paid pursuant to the

15   requirements of Labor Code §§ 201, 202, and 204 and thereby seek the unpaid

16   wages.  To date, for example, Defendants have not paid Plaintiffs all earned wages.

17       77.   Since March 1, 2019, Plaintiffs GLINOGA, GONZALES, NEELY,

18   have beenbegan working as UBER drivers by use of the UBER application, use of

19   their own car, and with the use of their own money for maintenance of the vehicle

20   and phone used to carry out their duties for UBER.

21       78.   Specifically, GLINOGA, GONZALEZ, and NEELY have used

22   Defendant UBER's application since March 1, 2019 to provide the transportation

23   service to UBER customers by turning on UBER's driver app and set the settings

24   so that they can see and accept UBER customer requests for a ride through the

25   UBER application.

26       79.   In this manner, since March 1, 2019, GLINOGA, GONZALEZ, and

27   NEELY have had the application set to "on," waiting for an UBER customer request

28   for long periods of time; often times spending more time waiting for a ride request

than driving a customer resulting in the compensation for said ride or rides over the course of a week to come out to less than minimum wage per hour.

80.    Also, since March 1, 2019, GLINOGA, GONZALEZ, and NEELY regularly had the UBER application on, waiting for and providing for UBER customers for over 8 hours a day, after having done this function 40 hours in a week. In the instances where GLINOGA, GONZALEZ, and NEELY earned enough to meet minimum wage for 40 hours of work in a week, they were not paid time and half for hours worked in excess of 40 hours in a week (i.e., over time pay of time and half).

80.81.Plaintiff GLINOGA, GONZALEZ, and NEELY stopped working for UBER in approximately March of 2020.  Accordingly, Plaintiffs employment relationships with UBER ended in or about March of 2020.

81.82.Plaintiffs and Class Members are informed and believe and based thereon allege that Defendants willfully failed to pay Plaintiffs' wages in the form of minimum wage and overtime page pursuant to the requirements of Labor Code §§ 201, 202, and 204, after Plaintiffs' demand, and therefore Plaintiffs are entitled the associated unpaid wages and waiting time penalties.  Plaintiffs are informed and believe and based thereon allege that Defendants did this with the intent to secure for themselves a discount on their indebtedness and/or with intent to annoy harass, oppress, hinder, delay and/or defraud Plaintiffs.

82.83.Plaintiffs and Class Members have been deprived of their rightfully earned wages as a direct and proximate result of Defendants' failure and refusal to pay said compensation and for the reasons alleged in this Complaint.

83.84.Plaintiffs and Class Members request the unpaid wages, waiting time penalties, interest, attorneys' fees, costs, damages, and other remedies in an amount to be proven at trial.

84.85.Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendant's violation of California Labor Code

§§ 201, 202, 203, 204, 218.5, and 218.6 through arbitration.

#

#

## SECOND CAUSE OF ACTION

**(Individual and Representative Claim for**

**Failure to Pay Minimum Wages in Violation of**

**California Labor Code §§ 1182.12, 1194,**

**1194.2, 1197, and Wage Order No. 4-2001 § 3(A))**

**(GLINOGA, GONZALEZ and NEELY Against All Defendants)**

85.86. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.

86.87. Pursuant to Labor Code §§ 1182.12, 1194, 1194.2, and 1197, it is unlawful for a California employer to suffer or permit an employee to work without paying wages for all hours worked, as required by the applicable Industrial Welfare Commission ("IWC") Wage Order.

87.88. During all times relevant, IWC Wage Order No. 4-2001, governing the "Professional, Technical, Clerical, Mechanical and Similar Occupations" industry, applied to Plaintiffs and the Class members' employment with Defendants.

88.89. Pursuant to Wage Order 4, section 2(K), "hours worked" include the time during which an employee is "suffered or permitted to work, whether or not required to do so."

89.90. IWC Wage Order No. 4-2001, § 4 (A), requires every employer to pay each employee minimum wages not less than $11.00 per hour effective January 1, 2018, $12.00 per hour effective January 1, 2019, and $13.00 per hour effective January 1, 2019 to the present time.

90.91. During all times relevant, Class Members including Plaintiffs have not been paid minimum wages for all hours suffered or permitted to work in violation of the minimum wage provisions of California Labor Code §§ 1182.12, 1194,

1194.2, and 1197, and IWC Wage Order No. 4-2001, § 4 (A).

~~91.~~92.Since March 1, 2019, Plaintiffs GLINOGA, GONZALES, and NEELY ~~have been~~began working as UBER drivers by use of the UBER application, use of their own car, and with the use of their own money for maintenance of the vehicle and phone used to carry out their duties for UBER.

~~92.~~93.Specifically, GLINOGA, GONZALEZ, and NEELY have used Defendant UBER's application since March 1, 2019 to provide the transportation service to UBER customers by turning on UBER's driver app and set the settings so that they can see and accept UBER customer requests for a ride through the UBER application.

94.    In this manner, since March 1, 2019, GLINOGA, GONZALEZ, and NEELY have had the application set to "on," waiting for an UBER customer request for long periods of time; often times spending more time waiting for a ride request than driving a customer resulting in the compensation for said ride or rides over the course of a week to come out to less than minimum wage per hour.

*Failure to Compensate for Time Waiting for Ride Notifications on Uber's App Has Led to Failure to Account for Hours Worked Which Led to a Failure to Pay Minimum Wage*

95.    Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have been driving for Defendants prior to March 1, 2019 continuing up to and until approximately March of 2020.   During the entirety of his employment, Plaintiff GLINOGA worked approximately 60 hours per week on average but was only paid by Defendants for approximately 30 of those hours on average. During the entirety of his employment, Plaintiff GONZALEZ worked approximately 50 to 60 hours per week but was only paid by Defendants for approximately 40 to 42 of those hours on average. During the entirety of his employment, Plaintiff NEELY worked approximately 55 hours per week but was only paid by Defendants for approximately 25 of those hours on average.   As such, Plaintiffs GLINOGA,

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  -1.75" + Tab after:  -1.5" + Indent at:  -1.5"

1   GONZALES, and NEELY were not earning minimum wage.  Defendants engaged

2   in this practice throughout the three-year statute of limitations that applies to this

3   action pursuant to 29 U.S.C. § 255.

4         96.    Specifically, Plaintiff GLINOGA worked approximately seven days a

5   week while employed by UBER.  From Monday through Thursday, Plaintiff

6   GLINOGA regularly worked from 5:00 p.m. to 12:00 a.m., for a total of

7   approximately seven hours a day.  If Plaintiff GLINOGA did not have to report to

8   his day job, he would work on Mondays through Thursdays from approximately

9   6:00 a.m. to 12:00 p.m., then again from 2:00 pm to 12:00 am, for a total of sixteen

10  hours, with a two-hour break in between.  On Fridays, Plaintiff GLINOGA regularly

11  worked from approximately 5:00 p.m. to 2:00 a.m., for a total of approximately nine

12  hours.  On Saturdays and Sundays, Plaintiff regularly worked from approximately

13  10:00 a.m. to 4:00 p.m., then again from 5:00 p.m. to 2:00 a.m., for a total of 15

14  hours, with a one-hour break in between.  During these times, Plaintiff GLINOGA

15  had his UBER application set to "on" while he was either transporting passengers,

16  or waiting for his next customer to request a ride.  Plaintiff GLINOGA turned his

17  Uber application "on" at the start of his day, and left the app on the entire time, with

18  the exception of his one or two-hour breaks.  During the entirety of his employment

19  with UBER, Plaintiff GLINOGA earned approximately $700.00 per week, for

20  working a total of approximately 67 hours a week on average.  Accordingly,

21  Plaintiff GLINOGA was earning approximately $10.44 per hour while employed

22  by UBER. Often times, a third or more of Plaintiff GLINOGA's earnings were used

23  to pay for gas for his vehicle.

24        97.    Moreover, Plaintiff NEELY consistently worked six days a week while

25  employed by UBER.  From Monday through Friday, Plaintiff NEELY regularly left

26  his house, got in his car, and turned the UBER application "on" at approximately

27  7:00 a.m.  Plaintiff NEELY left the application "on" all day, while he was either

28  transporting passengers, or waiting for his next customer to request a ride.  From

Monday through Friday, Plaintiff NEELY regularly turned the UBER application off for approximately one hour around 11:30 a.m. or 12:00 p.m. noon, in order to eat something and rest. On Mondays through Fridays, at approximately 5:00 to 6:00 p.m., Plaintiff NEELY would set his Uber application to a "destination" filter, which allowed the application to find him rides that were heading towards his home. Plaintiff NEELY generally turned his UBER application off and got home at approximately 6:30 p.m. on Monday through Friday, after working approximately ten hours total per day. On Saturdays, Plaintiff NEELY worked approximately five to six hours total, either in the morning or in the afternoon, with his UBER application set to "on" the entire time, with no breaks in between. Plaintiff NEELY did not work on Sundays. During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day. Accordingly, Plaintiff NEELY was earning approximately $8.50 per hour  (less than minimum wage) while employed by UBER.

98. Moreover, Plaintiff GONZALES worked 7 days a week while employed by UBER. From Monday through Thursday, Plaintiff GONZALES regularly left his house, got in his car, and turned the UBER application "on" at approximately 5:00 a.m. to 10:00 a.m. On Friday through Sunday, Plaintiff GONZALES left the application "on" from 3:00 pm to 3:00pm, with rare breaks during slower times. Plaintiff GONZALES typically worked 40-50 hours a week, and about 15 times a year would work 50-60 a week. During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day. Accordingly, Plaintiff NEELY was earning approximately $8.50 (less than minimum wage) per hour while employed by UBER.

Specific Workweeks of Plaintiff GONZALEZ:

• July 15 to 22, 2019 he totaled 54h 24m "online" / 38h 53m "active"

• Oct 21 to 28, 2019 he totaled 44h 10m "online" / 37h 13m "active"

• Dec 2 to 9, 2019 he totaled 50h 7m "online" / 35h 42m "active"

• Jan 20 to 27, 2020 he totaled 66h 4m "online" / 39h 15m "active"

99.   These differential demonstrate how Plaintiff GONZALEZ waiting hours in a work week for which they were not compensated as "waiting time," thus leading to a failure to be paid minimum wage, as well as failure to pay at an overtime rate for applicable hours worked over 40 in a work week

100.   The times in which Plaintiffs had their application set to "on," Plaintiffs were either waiting for a ride request, driving to or from a customer pick up or drop off location, or driving a customer.   These hours worked are compensable since Plaintiffs were suffered or permitted to work during these times, whether or not required to do so.  Plaintiffs were suffered or permitted to work up to twelve (12) hours a day.  Once a driver reached twelve (12) hours, the UBER application would not allow them to continue working additional hours for at least the next eight (8) consecutive hours.

101.   Specifically, Plaintiff GLINOGA worked approximately seven days a week while employed by UBER.  From Monday through Thursday, Plaintiff GLINOGA regularly worked from 5:00 p.m. to 12:00 a.m., for a total of approximately seven hours a day.  If Plaintiff GLINOGA did not have to report to his day job, he would work on Mondays through Thursdays from approximately 6:00 a.m. to 12:00 p.m., then again from 2:00 pm to 12:00 am, for a total of sixteen hours, with a two-hour break in between.  On Fridays, Plaintiff GLINOGA regularly worked from approximately 5:00 p.m. to 2:00 a.m., for a total of approximately nine hours.  On Saturdays and Sundays, Plaintiff regularly worked from approximately 10:00 a.m. to 4:00 p.m., then again from 5:00 p.m. to 2:00 a.m., for a total of 15 hours, with a one-hour break in between.  During these times, Plaintiff GLINOGA had his UBER application set to "on" while he was either transporting passengers, or waiting for his next customer to request a ride.  Plaintiff GLINOGA turned his Uber application "on" at the start of his day, and left the app

on the entire time, with the exception of his one or two-hour breaks.  During the entirety of his employment with UBER, Plaintiff GLINOGA earned approximately $700.00 per week, for working a total of approximately 67 hours a week on average.  Accordingly, Plaintiff GLINOGA was earning approximately $10.44 per hour while employed by UBER. Often times, a third or more of Plaintiff GLINOGA's earnings were used to pay for gas for his vehicle.

Moreover, Plaintiff NEELY consistently worked six days a week while employed by UBER.  From Monday through Friday, Plaintiff NEELY regularly left his house, got in his car, and turned the UBER application "on" at approximately 7:00 a.m.  Plaintiff NEELY left the application "on" all day, while he was either transporting passengers, or waiting for his next customer to request a ride. From Monday through Friday, Plaintiff NEELY regularly turned the UBER application off for approximately one hour around 11:30 a.m. or 12:00 p.m. noon, in order to eat something and rest.  On Mondays through Fridays, at approximately 5:00 to 6:00 p.m., Plaintiff NEELY would set his Uber application to a "destination" filter, which allowed the application to find him rides that were heading towards his home.  Plaintiff NEELY generally turned his UBER application off and got home at approximately 6:30 p.m. on Monday through Friday, after working approximately ten hours total per day.  On Saturdays, Plaintiff NEELY worked approximately five to six hours total, either in the morning or in the afternoon, with his UBER application set to "on" the entire time, with no breaks in between.  Plaintiff NEELY did not work on Sundays.  During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day.  Accordingly, Plaintiff NEELY was earning approximately $8.50 to $12.00 per hour while employed by UBER.

102.

1.103. Labor Code § 1194.2, subdivision (a) provides that, in an action to

recover wages because of the payment of a wage less than the minimum wage fixed by IWC Wage Orders, an employee is entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon.

~~2.~~ 104. Class Members, including Plaintiffs, should have received minimum wages in a sum according to proof during all times relevant to this action.

~~3.~~ 105. Defendants have intentionally failed and refused, and continue to fail and refuse, to pay Class Members, including Plaintiffs, minimum wages for all time suffered or permitted to work.

~~4.~~ 106. Plaintiffs, on behalf of themselves and the Class, request the recovery of the unpaid minimum wages, waiting time penalties, liquidated damages, interest, attorneys' fees, and costs in an amount to be determined at trial.

~~93.      Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendant's violation of California Labor Code §§ 1182.12, 1194, 1194.2, 1197, and Wage Order No. 4-2001 § 3(A) through arbitration.~~

~~**THIRD CAUSE OF ACTION**~~
~~**(Individual and Representative Claim for**~~
~~**Failure to Maintain Required Records in Violation of**~~
~~**California Labor Code § 1174.5 and Wage Order No. 4, § 7)**~~
~~**(GLINOGA, GONZALEZ and NEELY Against All Defendants)**~~

~~94.     Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.~~

~~95.     At all times relevant herein, IWC Wage Order No. 4, § 7 requires every employer to maintain time records showing when the employee begins and ends each shift and payroll records~~

~~96.     Plaintiffs are informed and believe and based thereon allege that during all times relevant to the Class Period, Defendants failed to comply with § 7 of IWC Order 4-2001 and with Labor Code § 1174 by failing to maintain certain records~~

1  which employers are required to maintain, including but not limited to, records of
2  hours worked, meal periods provided to each employee, and overtime worked, and
3  wages paid.

4  97.  Since March 1, 2019, Plaintiffs GLINOGA, GONZALES, and
5  NEELY have been began working as UBER drivers by use of the UBER
6  application, use of their own car, and with the use of their own money for
7  maintenance of the vehicle and phone used to carry out their duties for UBER.

8  98.  Specifically, GLINOGA, GONZALEZ, and NEELY have used
9  Defendant UBER's application since March 1, 2019 to provide the transportation
10  service to UBER customers by turning on UBER's driver app and set the settings
11  so that they can see and accept UBER customer requests for a ride through the
12  UBER application.

13  99.  In this manner, since March 1, 2019, GLINOGA, GONZALEZ, and
14  NEELY have had the application set to "on," waiting for an UBER customer
15  request for long periods of time; often times spending more time waiting for a ride
16  request than driving a customer resulting in the compensation for said ride or rides
17  over the course of a week to come out to less than minimum wage per hour.

18  100.  Also, since March 1, 2019, GLINOGA, GONZALEZ, and NEELY
19  regularly had the UBER application on, waiting for and providing for UBER
20  customers for over 8 hours a day, after having done this function 40 hours in a
21  week.  In the instances where GLINOGA, GONZALEZ and NEELY earned
22  enough to meet minimum wage for 40 hours of work in a week, they were not paid
23  time and half for hours worked in excess of 40 hours in a week (i.e., over time pay
24  of time and half).

25  101.  For the reasons alleged in this Complaint, Plaintiffs seek any and all
26  available remedies in an amount to be proven at trial including but not limited to
27  damages, attorneys' fees and costs, and interest.

28  Non-Representative Plaintiffs will be enforcing any of their respective

~~individual rights and remedies for Defendant's violation of California Labor Code~~
~~§ 1174.5 and Wage Order No. 4, § 7 through arbitration.~~

~~102.~~107.

**FOURTH ~~THIRD~~ CAUSE OF ACTION**

**(Individual and Representative Claim for**

**Penalties for Violations of California Labor Code § 226 for**

**Failure to Provide Accurate Wage Statements)**

**(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

~~5.~~108. Plaintiffs re-allege and incorporate by reference the foregoing
allegations as though set forth herein.

~~6.~~109. Plaintiffs allege that Labor Code § 226 subdivision (a) requires, in
pertinent part, that "Every employer shall, semimonthly or at the time of each
payment of wages, furnish each of his or her employees, either as a detachable part
of the check, draft, or voucher paying the employee's wages, or separately when
wages are paid by personal check or cash, an accurate itemized statement in writing
showing: (1) gross wages earned; (2) total hours worked by the employee, except
for any employee whose compensation is solely based on a salary and who is
exempt from payment of overtime under subdivision (a) of § 515 or any applicable
order of the Industrial Welfare Commission; (3) the number of piece-rate units
earned and any applicable piece rate if the employee is paid on a piece-rate basis;
(4) all deductions, provided that all deductions made on written orders of the
employee may be aggregated and shown as one item; (5) net wages earned; (6) the
inclusive dates of the period for which the employee is paid; (7) the name of the
employee and his or her social security number, except that by January 1, 2008,
only the last four digits of his or her social security number or an employee
identification number other than a social security number may be shown on the
itemized statement; (8) the name and address of the legal entity that is the

*Formatted: Indent: Left: 0.06", First line: 0.44",
Numbered + Level: 1 + Numbering Style: 1, 2, 3, … +
Start at: 1 + Alignment: Left + Aligned at: -1.75" + Tab
after: -1.5" + Indent at: -1.5"*

employer; and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee. . ." (Labor Code § 226 subdivision (a)).

7.110.Upon information and belief, during all times relevant to this action, debt collectors, including Plaintiffs, never received any wage statement at all, let alone a wage statement with all required information set forth under Labor Code § 226 from Defendants, and Plaintiffs suffered damages from not receiving wage statements.

8.111.Plaintiffs allege that, on numerous occasions, an exact amount by which will be proven at trial, Defendants violated various provisions of § 226, including but not limited to subdivisions (a)(1), (a)(2), (a)(4), (a)(5), (a)(6), (a)(7), (a)(8), and (a)(9) by failing to provide Plaintiffs accurate itemized statement in writing showing: (1) gross wages earned; (2) total hours worked by the employee; (3) all deductions; (4) net wages earned; (5) the inclusive dates of the period for which the employee is paid; (6) the name of the employee; (7) the name and address of the legal entity that is the employer; and (8) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

112.Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have been driving for Defendants prior to March 1, 2019 continuing up to and until approximately March of 2020.  Plaintiffs employment with UBER ended in or about March of 2020.  To date, Plaintiffs GLINOGA, GONZALES, and NEELY have not once received any wage statement whatsoever, let alone a wage statement with all required information set forth under Labor Code § 226.

9.113.Ubers failure to provide wage statements consistent with Labor Code § 226's requirements was willful and intentional after it became on notice in April 2018 when the ABC test first was establish through Dynamex.  At the very least, Uber was on notice that Plaintiffs and Class Members were employees under Labor

Code § 2750.3 (a.k.a., "AB5") in September 2019 through the enactment of Prop 22.   After an employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional, i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation.   (*Patel v. Nike Retail Services*, Inc. (N.D.Cal.2014) 58 F.Supp.3d 1032.)

10.114.   For Defendants' misconduct as alleged in this Complaint, Plaintiffs seek damages, penalties, costs and attorneys' fees pursuant to Labor Code § 226 subdivision (e) in an amount to be proven at trial.

11.115.   For Defendants' misconduct as alleged herein, Plaintiffs seek injunctive relief and attorneys' fees and costs pursuant to § 226 subdivision (g) in an amount to be proven at trial.

12.116.   Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendant's violation of California Labor Code § 226 through arbitration.

**FIFTH FOURTH CAUSE OF ACTION**

**(Individual and Representative Claim**

**Failure to Pay Required Minimum Wages in Violation of**

**Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206)**

**(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

13.117.   Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.

118.   At all times relevant, Defendants have willfully and intentionally failed to pay Plaintiffs and Class Members minimum wage as required by 29 U.S.C. § 206.

***Standby/On-Call Time Is Compensable Under Federal and State Law***

119.   California's Wage Order No. 4 of the Industrial Welfare Commission defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (IWC Wage Order No. 4-2001, sec. 2, subsec. (k).)   Under California law, on-call waiting time is compensable if it is spent primarily for the benefit of the employer and its business. (Gomez v. Lincare, Inc. (2009) 173 Cal. App. 4th 508, 522 (adopting test set forth in Owens v. Local No. 169, Ass'n of Western Pulp & Paper Workers (9th Cir. 1992) 971 F. 2d 347); *Armour & Co. v. Wantock* (1944) 323 U.S. 126, 132; *Skidmore v. Swift & Co.* (1944) 323 U.S. 134.)   "Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." (*Armour* at 133.).   The relevant factual inquiry is whether an employee is "engaged to wait" or waiting to be engaged.   (*Skidmore*, at 133.)

120.   There can be no dispute that for Plaintiffs and Class Members to provide the service of an Uber ride for an Uber customer, they must use Uber's application to be connected with that Uber customer.   In other words, a driver is ignorant of an Uber customer's need for a ride without use of Uber's application. Ergo, Plaintiff and Class members are controlled by Uber (the employer), through Uber's application, because Uber permits (at its discretion and without any transparency) how and when the Plaintiffs and Class Members are notified of an Uber customer's solicitation of a ride through Uber's digital platform.

121.   Without use of Uber's application for notification of an Uber customer's request for a ride, and waiting for Uber to notify Plaintiff and Class Members of a customer's request for a ride, Plaintiff and Class Members cannot connect with a customer which in turn prevents the customer and the driver from ever connecting.   In fact, Uber incentivizes Plaintiffs and Class Members to wait for a rider notification with surge pricing during events that Uber anticipates will lead to high demand for Uber rides; e.g., high density of bars, nightclubs, concerts,

1    sporting events etc.

2        122.  Waiting on Uber's application for a ride notification is the *only* method

3    Plaintiff and Class Members can ever learn an opportunity to provide a ride to an

4    Uber customer.   The Uber ride, where driver and customer meet, cannot be

5    effectuated without their participation in Uber's exclusive digital platform a.k.a.,

6    the Uber app.  Under this practical and indisputable reality, Plaintiff and Class

7    Members are "engaged to wait" on Uber's application for Uber to notify them of a

8    customer's ride request, in order to provide the Uber customer the benefit of the

9    service provided by Uber – a car ride, at a predetermined estimated price, with an

10   estimated time of pickup, and estimated time of arrival, that can be paid by anyone,

11   that can be shared with anyone, and all made possible through (exclusive) use of

12   Uber's app.

13       123. Moreover, Plaintiffs' and Class Members' time spent waiting on the

14   application for a rider notification is for the benefit of Uber, as Uber charges the

15   customer for rides Plaintiffs and Class Members are waiting on the Uber app to be

16   notified of.

17       124.  Because this waiting time (a.k.a., standby time) on Uber's application

18   is inextricably intertwined Plaintiffs'/Class Members' ability to provide a ride (or

19   customers to solicit a ride) that benefits and is controlled by Uber, the time waiting

20   on the app is for the benefit of Uber, and should be compensated as "hours worked"

21   under California and federal law.

22          ***Failure to Compensate for Time Waiting for Ride Notifications on***

23   ~~103.~~        ***Uber's App Has Led to Failure to Account for Hours Worked Which***

24                    ***Led to a Failure to Pay Minimum Wage***,

25       125.  Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have

26   been driving for Defendants prior to March 1, 2019 continuing up to and until

27   approximately March of 2020.   During the entirety of his employment, Plaintiff

28   GLINOGA worked approximately 60 hours per week on average but was only paid

by Defendants for approximately 30 of those hours on average. During the entirety of his employment, Plaintiff GONZALES worked approximately 50 to 60 hours per week but was only paid by Defendants for approximately 40 to 42 of those hours on average. During the entirety of his employment, Plaintiff NEELY worked approximately 45 55 hours per week but was only paid by Defendants for approximately 25 of those hours on average.   As such, Plaintiffs GLINOGA, GONZALES, and NEELY were not earning minimum wage.  Defendants engaged in this practice throughout the three-year statute of limitations that applies to this action pursuant to 29 U.S.C. § 255.

126.   Specifically, Plaintiff GLINOGA worked approximately seven days a week while employed by UBER.  From Monday through Thursday, Plaintiff GLINOGA regularly worked from 5:00 p.m. to 12:00 a.m., for a total of approximately seven hours a day.  If Plaintiff GLINOGA did not have to report to his day job, he would work on Mondays through Thursdays from approximately 6:00 a.m. to 12:00 p.m., then again from 2:00 pm to 12:00 am, for a total of sixteen hours, with a two-hour break in between.   On Fridays, Plaintiff GLINOGA regularly worked from approximately 5:00 p.m. to 2:00 a.m., for a total of approximately nine hours.  On Saturdays and Sundays, Plaintiff regularly worked from approximately 10:00 a.m. to 4:00 p.m., then again from 5:00 p.m. to 2:00 a.m., for a total of 15 hours, with a one-hour break in between.  During these times, Plaintiff GLINOGA had his UBER application set to "on" while he was either transporting passengers, or waiting for his next customer to request a ride.  Plaintiff GLINOGA turned his Uber application "on" at the start of his day, and left the app on the entire time, with the exception of his one or two-hour breaks.  During the entirety of his employment with UBER, Plaintiff GLINOGA earned approximately $700.00 per week, for working a total of approximately 67 hours a week on average.  Accordingly, Plaintiff GLINOGA was earning approximately $10.44 per

1   hour while employed by UBER. Often times, a third or more of Plaintiff
2   GLINOGA's earnings were used to pay for gas for his vehicle.
3   127.  Moreover, Plaintiff NEELY consistently worked six days a week while
4   employed by UBER.  From Monday through Friday, Plaintiff NEELY regularly
5   left his house, got in his car, and turned the UBER application "on" at
6   approximately 7:00 a.m.  Plaintiff NEELY left the application "on" all day, while
7   he was either transporting passengers, or waiting for his next customer to request
8   a ride.  From Monday through Friday, Plaintiff NEELY regularly turned the UBER
9   application off for approximately one hour around 11:30 a.m. or 12:00 p.m. noon,
10  in order to eat something and rest.  On Mondays through Fridays, at approximately
11  5:00 to 6:00 p.m., Plaintiff NEELY would set his Uber application to a
12  "destination" filter, which allowed the application to find him rides that were
13  heading towards his home.  Plaintiff NEELY generally turned his UBER
14  application off and got home at approximately 6:30 p.m. on Monday through
15  Friday, after working approximately ten hours total per day.  On Saturdays,
16  Plaintiff NEELY worked approximately five to six hours total, either in the
17  morning or in the afternoon, with his UBER application set to "on" the entire time,
18  with no breaks in between.  Plaintiff NEELY did not work on Sundays.  During the
19  entirety of his employment with UBER, Plaintiff NEELY earned approximately
20  $85.00 to $120.00 per day, while working at least ten hours a day.  Accordingly,
21  Plaintiff NEELY was earning approximately $8.50 per hour  (less than minimum
22  wage) to $12.00 per hour while employed by UBER.R.
23  128. Moreover, Plaintiff GONZALES worked 7 days a week while
24  employed by UBER.  From Monday through Thursday, Plaintiff GONZALES
25  regularly left his house, got in his car, and turned the UBER application "on" at
26  approximately 5:00 a.m. to 10:00 a.m.  On Friday through Sunday, Plaintiff
27  GONZALES left the application "on" from 3:00 pm to 3:00pm, with rare breaks
28  during slower times.  Plaintiff GONZALES typically worked 40-50 hours a week,

and about 15 times a year would work 50-60 a week. During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day.  Accordingly, Plaintiff NEELY was earning approximately $8.50 (less than minimum wage) per hour while employed by UBER.

129.  Specific Workweeks of Plaintiff GONZALEZ:

130.  • July 15 to 22, 2019 he totaled 54h 24m "online" / 38h 53m "active"

131.  • Oct 21 to 28, 2019 he totaled 44h 10m "online" / 37h 13m "active"

132.  • Dec 2 to 9, 2019 he totaled 50h 7m "online" / 35h 42m "active"

133.  • Jan 20 to 27, 2020 he totaled 66h 4m "online" / 39h 15m "active"

14.

134. These differential demonstrate how Plaintiff GONZALEZ waiting hours in a work week for which they were not compensated as "waiting time," thus leading to a failure to be paid minimum wage, as well as failure to pay at an overtime rate for applicable hours worked over 40 in a work week.

15.135.    Therefore, at all times relevant, Defendants operated under and continue to operate under a common policy and plan of willfully, regularly, and repeatedly failing and refusing to pay minimum compensation at the rates required by the California Law, currently $12.00 per hour.

16.136.    As alleged herein, Defendants do not pay Plaintiffs and Class Members a regular wage.  As a result, Defendants have failed to comply with 29 U.S.C. § 206 in that they have failed to timely pay at least minimum wages for all hours worked to the Plaintiffs and Class Members.

17.137.    As a result of the unlawful acts of Defendants, Plaintiffs and Class Members and all FLSA Plaintiffs who opt-in are entitled to recovery in the amounts of their respective unpaid minimum wages, liquidated damages, prejudgment interest, attorneys' fees and costs, and any other relief the Court deems just and proper pursuant to FLSA, 29 U.S.C. § 216(b).

1    ~~18.~~139.    Non-Representative Plaintiffs will be enforcing any of their

2    respective individual rights and remedies for Defendant's failure to pay minimum

3    wage under the Fair Labor Standards Act through arbitration.

4    #

5    #

6    #

7    **~~SIXTH~~FIFTH CAUSE OF ACTION**

8    **(Individual and Representative Claim Failure to Pay Required Overtime**

9    **Wages in Violation of FLSA, 29 U.S.C. § 207; 29 CFR §778.106)**

10    **(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

11    ~~19.~~139.    Plaintiffs re-allege and incorporate by reference the foregoing

12    allegations as though set forth herein.

13    ~~20.~~140.    At all times relevant, Defendants employed and continue to

14    employ "employee[s]" within the meaning of FLSA, 29 U.S.C. § 203.

15    ~~21.~~141.    However, Defendants have willfully and intentionally engaged

16    in a widespread pattern and practice of violating the provisions of the FLSA by

17    failing to pay Plaintiffs and Class Members overtime wages as required by 29

18    U.S.C. § 207.

19    ~~22.~~142.    Defendants engaged in this practice throughout the three-year

20    statute of limitations that applies to this action pursuant to 29 U.S.C. § 255.

21    ~~23.~~143.    Therefore, at all times relevant, Defendants operated under and

22    continue to operate under a common policy and plan of willfully, regularly, and

23    repeatedly failing and refusing to pay Plaintiffs and Class Members overtime

24    compensation at the rates required by the FLSA, 29 U.S.C. § 207 for work

25    performed in excess of forty (40) hours per workweek to which they were and are

26    entitled.

27    ~~24.~~144.    Pursuant to 29 CFR § 778.106, Defendants are required to pay

28    overtime compensation earned in a workweek on the regular pay day for the period

Formatted: Font: Bold, Underline

Formatted: Font: Bold, Underline

Formatted: Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  -1.75" + Tab after:  -1.5" + Indent at:  -1.5", Tab stops: Not at  0.94"

in which such workweek ends.  When the correct overtime compensation cannot be calculated until after the regular payday, then the FLSA requires that the overtime payment be made as soon after the regular payday as is practicable, but no later than the next pay day after the computation can be made.

145.   As alleged herein, Defendants do not pay Plaintiffs and Class Members overtime.  As a result, Defendants have failed to comply with California Labor Code § 510 in that they fail to timely pay overtime wages to Plaintiffs and Class Members.

*Failure to Compensate for Time Waiting for Ride Notifications on Uber's App Has Led to a Failure to Account for Hours Worked, Leading to a Failure to Pay Overtime*

146.   Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have been driving for Defendants prior to March 1, 2019 continuing up to and until approximately March of 2020.   During the entirety of his employment, Plaintiff GLINOGA worked approximately 60 hours per week on average but was only paid by Defendants for approximately 30 of those hours on average. During the entirety of his employment, Plaintiff GONZALES worked approximately 50 to 60 hours per week but was only paid by Defendants for approximately 40 to 42 of those hours on average. During the entirety of his employment, Plaintiff NEELY worked approximately 55 hours per week but was only paid by Defendants for approximately 25 of those hours on average.  As such, Plaintiffs GLINOGA, GONZALES, and NEELY were not earning minimum wage.  Defendants engaged in this practice throughout the three-year statute of limitations that applies to this action pursuant to 29 U.S.C. § 255.

147.   Specifically, Plaintiff GLINOGA worked approximately seven days a week while employed by UBER.  From Monday through Thursday, Plaintiff GLINOGA regularly worked from 5:00 p.m. to 12:00 a.m., for a total of approximately seven hours a day.  If Plaintiff GLINOGA did not have to report to his day job, he would work on Mondays through Thursdays from approximately

6:00 a.m. to 12:00 p.m., then again from 2:00 pm to 12:00 am, for a total of sixteen hours, with a two-hour break in between.  On Fridays, Plaintiff GLINOGA regularly worked from approximately 5:00 p.m. to 2:00 a.m., for a total of approximately nine hours.  On Saturdays and Sundays, Plaintiff regularly worked from approximately 10:00 a.m. to 4:00 p.m., then again from 5:00 p.m. to 2:00 a.m., for a total of 15 hours, with a one-hour break in between.  During these times, Plaintiff GLINOGA had his UBER application set to "on" while he was either transporting passengers, or waiting for his next customer to request a ride.  Plaintiff GLINOGA turned his Uber application "on" at the start of his day, and left the app on the entire time, with the exception of his one or two-hour breaks.  During the entirety of his employment with UBER, Plaintiff GLINOGA earned approximately $700.00 per week (Sunday through Saturday), for working a total of approximately 67 hours worked a week on average, 27 of which were subject to a .  Accordingly, Plaintiff GLINOGA was earning approximately $10.44 per hour while employed by UBER. Often times, a third or more of Plaintiff GLINOGA's earnings were used to pay for gas for his vehicle.

148.  Moreover, Plaintiff NEELY consistently worked six days a week while employed by UBER, during a work week of Sunday through Saturday.  From Monday through Friday, Plaintiff NEELY regularly left his house, got in his car, and turned the UBER application "on" at approximately 7:00 a.m.  Plaintiff NEELY left the application "on" all day, while he was either transporting passengers, or waiting for his next customer to request a ride.  From Monday through Friday, Plaintiff NEELY regularly turned the UBER application off for approximately one hour around 11:30 a.m. or 12:00 p.m. noon, in order to eat something and rest.  On Mondays through Fridays, at approximately 5:00 to 6:00 p.m., Plaintiff NEELY would set his Uber application to a "destination" filter, which allowed the application to find him rides that were heading towards his home.  Plaintiff NEELY generally turned his UBER application off and got home at approximately 6:30 p.m.

on Monday through Friday, after working approximately ten hours total per day. On Saturdays, Plaintiff NEELY worked approximately five to six hours total, either in the morning or in the afternoon, with his UBER application set to "on" the entire time, with no breaks in between.  Plaintiff NEELY did not work on Sundays. During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day. Accordingly, Plaintiff NEELY was earning approximately $8.50 per hour (less than minimum wage) while employed by UBER.

149. Moreover, Plaintiff GONZALES worked 7 days a week while employed by UBER.  From Monday through Thursday, Plaintiff GONZALES regularly left his house, got in his car, and turned the UBER application "on" at approximately 5:00 a.m. to 10:00 a.m.  On Friday through Sunday, Plaintiff GONZALES left the application "on" from 3:00 pm to 3:00pm, with rare breaks during slower times.  Plaintiff GONZALES, typically worked 40-50 hours a week (10 of which were overtime hours worked), and about 15 times a year would work 50-60 a week (10 to 20 of them as overtime hours worked). During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day.  Accordingly, Plaintiff NEELY was earning approximately $8.50 (less than minimum wage) per hour while employed by UBER.

Specific Workweeks of Plaintiff GONZALEZ:

• July 15 to 22, 2019 he totaled 54h 24m "online" / 38h 53m "active"

• Oct 21 to 28, 2019 he totaled 44h 10m "online" / 37h 13m "active"

• Dec 2 to 9, 2019 he totaled 50h 7m "online" / 35h 42m "active"

• Jan 20 to 27, 2020 he totaled 66h 4m "online" / 39h 15m "active"

25.156.   These differential demonstrate how Plaintiff GONZALEZ waiting hours in a work week for which they were not compensated as "waiting

time," thus leading to a failure to be paid minimum wage, as well as failure to pay at an overtime rate for applicable hours worked over 40 in a work week.

157. Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have been driving for Defendants prior to March 1, 2019 continuing up to and until approximately March of 2020.   During the entirety of his employment, Plaintiff GLINOGA worked approximately 20 hours of overtime each week on average. During the entirety of his employment, Plaintiff GONZALES worked approximately 10 to 20 hours of overtime each week on average.  During the entirety of his employment, Plaintiff NEELY worked approximately 15 hours of overtime each week on average.  To date, Defendants have not paid Plaintiffs GLINOGA, GONZALES, and NEELY proper overtime pay for the overtime hours they worked.

158.  Specifically, Plaintiff GLINOGA worked approximately seven days a week while employed by UBER.  From Monday through Thursday, Plaintiff GLINOGA regularly worked from 5:00 p.m. to 12:00 a.m., for a total of approximately seven hours a day.  If Plaintiff GLINOGA did not have to report to his day job, he would work on Mondays through Thursdays from approximately 6:00 a.m. to 12:00 p.m., then again from 2:00 pm to 12:00 am, for a total of sixteen hours, with a two-hour break in between.  On Fridays, Plaintiff GLINOGA regularly worked from approximately 5:00 p.m. to 2:00 a.m., for a total of approximately nine hours.  On Saturdays and Sundays, Plaintiff regularly worked from approximately 10:00 a.m. to 4:00 p.m., then again from 5:00 p.m. to 2:00 a.m., for a total of 15 hours, with a one-hour break in between.  During these times, Plaintiff GLINOGA had his UBER application set to "on" while he was either transporting passengers, or waiting for his next customer to request a ride.  Plaintiff GLINOGA turned his Uber application "on" at the start of his day, and left the app on the entire time, with the exception of his one or two-hour breaks.  During the entirety of his employment with UBER, Plaintiff GLINOGA earned approximately $700.00 per week, for

working a total of approximately 67 hours a week on average.  Accordingly, Plaintiff GLINOGA was earning approximately $10.44 per hour while employed by UBER. Often times, a third or more of Plaintiff GLINOGA's earnings were used to pay for gas for his vehicle.

159. Moreover, Plaintiff NEELY consistently worked six days a week while employed by UBER.  From Monday through Friday, Plaintiff NEELY regularly left his house, got in his car, and turned the UBER application "on" at approximately 7:00 a.m.  Plaintiff NEELY left the application "on" all day, while he was either transporting passengers, or waiting for his next customer to request a ride.  From Monday through Friday, Plaintiff NEELY regularly turned the UBER application off for approximately one hour around 11:30 a.m. or 12:00 p.m. noon, in order to eat something and rest.  On Mondays through Fridays, at approximately 5:00 to 6:00 p.m., Plaintiff NEELY would set his Uber application to a "destination" filter, which allowed the application to find him rides that were heading towards his home.  Plaintiff NEELY generally turned his UBER application off and got home at approximately 6:30 p.m. on Monday through Friday, after working approximately ten hours total per day.  On Saturdays, Plaintiff NEELY worked approximately five to six hours total, either in the morning or in the afternoon, with his UBER application set to "on" the entire time, with no breaks in between.  Plaintiff NEELY did not work on Sundays.  During the entirety of his employment with UBER, Plaintiff NEELY earned approximately $85.00 to $120.00 per day, while working at least ten hours a day.  Accordingly, Plaintiff NEELY was earning approximately $8.50 to $12.00 per hour while employed by UBER.

1.160.    Plaintiffs GLINOGA and NEELY fondly recall working well over forty (40) hours in a seven-day workweek during the holiday season.  For example, Plaintiff NEELY recalls working over forty (40) hours per week during the time from December 19, 2017 through January 2, 2018.  Plaintiff GLINOGA also recalls working over forty (40) hours per week during the time from December

19, 2017 through January 2, 2018, as well as the week of October 31, 2016, and the week of November 21, 2016.

2.161.   At all times relevant, Defendants have also operated under and continue to operate under a common policy and plan of willfully, regularly, and repeatedly failing and refusing to pay overtime compensation at the rates required by Labor Code § 510.

3.162.   As a result of the unlawful acts of Defendants, Plaintiffs and all FLSA Class Members who opt-in are entitled to recovery in the amounts of their respective unpaid overtime wages, liquidated damages, prejudgment interest, attorneys' fees and costs, and any other relief the Court deems just and proper.

4.163.   Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendant's violation of unpaid overtime under the FLSA through arbitration.

**SEVENTH SIXTH CAUSE OF ACTION**

**(Individual and Representative Claim Under the California**

**Unfair Business Practices Act, California**

**Business and Professions Code §§ 17200, *et seq*.)**

**(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

5.164. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.

6.165. Defendants, and each of them, are "persons" as defined under Business and Professions Code § 17021.

7.166. Plaintiffs are informed and believe and based thereon allege that Defendants committed the unfair business practices, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by violating the laws alleged to have been violated in this Complaint and which allegations are incorporated herein by reference and include, but are not limited to:

(a)   Defendants' policy or practice of not paying Plaintiffs

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: -1.75" + Tab after: -1.5" + Indent at: -1.5"

minimum wages and overtime compensation in violation of California law and FLSA;

(b) Defendants' policy or practice of not paying ride-share drivers all their wages due in their final paychecks immediately upon involuntary termination or when 72-hour notice was provided before voluntary resignation, is unlawful under Labor Code §§ 201, 202 and/or 203;

(c) Defendants violated Labor Code § 204 by not paying Plaintiffs in a timely fashion;

(d) Defendants violated Labor Code §§ 226 by not providing accurate pay stubs; and

(e) Defendants violated California Industrial Welfare Commission ("IWC") Wage Order Nos. 4-2001, 4-2000, and 4-1998 by not keeping accurate time records;

8.167. The practices described above were unfair within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., because the acts were intentionally performed to harm Plaintiffs.

9.168. Plaintiffs are informed and believe, and based thereon allege, that the unlawful, unfair, and fraudulent business practices described above present a continuing threat to members of the public because Defendants continue to operate in the illegal manner as alleged above.

10.169. Further, such skirting of the California labor laws presents a threat to the general public in that the enforcement of the labor laws is essential to ensure that all California employers compete equally, and that no California employer receives an unfair competitive advantage at the expense of its employees.

11.170. As a result of the above-alleged misconduct, Plaintiffs, on behalf

of themselves and Class Members, have been deprived of lawful wages to which they were entitled.  Plaintiffs and Class Members have suffered damages, in an amount to be determined according to proof at trial.

12.171.	The unfair, fraudulent, and unlawful business practices of Defendants are likely to continue because Defendants appear to have a pattern and practice of committing the same type of misconduct as alleged herein.  Therefore, the imposition of a preliminary injunction is justified.

13.172.	As a direct and proximate result of the above-alleged misconduct, Plaintiffs are entitled to and hereby seek injunctive relief and restitution for, among other things, back pay, and other lost benefits in an amount to be proven at trial from the date *Dynamex* was published to the date of trial.

14.173.	As a direct and proximate result of the aforesaid acts and conduct of said Defendants, Plaintiffs are entitled to and hereby seek attorneys' fees as permitted by law and as provided for by §1021.5 of the California Code of Civil Procedure.

15.174.	Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendant's violation of Business & Professions Code § 17200 through arbitration.

//

**EIGHTH CAUSE OF ACTION**

**(Individual and Representative Claim Under the Private Attorney General Act, California Labor Code §§ 2698, et seq.)**

**(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

Plaintiffs re-allege and incorporate by reference the foregoing allegations as though set forth herein.

The Non-Representative Plaintiffs will not be seeking to be representative aggrieved employees for a claim under California Labor Code §§ 2698, et seq.

California Labor Code §§ 2698, et seq., the Private Attorney General Act ("PAGA") permits Plaintiffs to recover civil penalties for the violation(s) of the Labor Code.

[Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: -1.75" + Tab after: -1.5" + Indent at: -1.5"]

At all times herein set forth, PAGA was applicable to Plaintiff's employment by Defendants.

At all times herein set forth, PAGA provides that any provision of law under the California Labor Code that provides for a civil penalty to be assessed and collected by the LWDA for violations of the California Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of herself and other current or former employees pursuant to procedures in California Labor Code section 2699.3.

Pursuant to PAGA, a civil action under PAGA may be brought by an "aggrieved employee," who is any person that was employed by the alleged violator and against whom one or more of the alleged violations was committed.

Plaintiffs were employed by Defendant and the alleged violations were committed against them during their time of employment and they are, therefore, Aggrieved Employees.  Plaintiffs and other employees are Aggrieved Employees as defined by California Labor Code section 2699(c) in that they are all current or former employees of Defendant who are or were employed as misclassified independent contractors, and one or more of the alleged violations were committed against them.

Pursuant to California Labor Code sections 2699.3 and 2699.5, an aggrieved employee, including Plaintiffs, may pursue a civil action arising under PAGA after the following requirements have been met:  The aggrieved employee shall give written notice by certified mail (hereinafter "Employee's Notice") to the LWDA and the employer of the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support the alleged violations.  The LWDA shall provide notice (hereinafter "LWDA Notice") to the employer and the aggrieved employee by certified mail that it does not intend to investigate the alleged violation within thirty (30) calendar days of the postmark date of the Employee's Notice.  Upon receipt of the LWDA Notice, or if the LWDA Notice is not provided within thirty three (33) calendar days of the postmark date of the Employee's Notice, the aggrieved employee may commence a civil action pursuant to California Labor Code section 2699 to recover civil penalties in addition to any other penalties to which the employee may be entitled.

On or about November 1, 2019, Plaintiffs provided written notice by certified mail to the LWDA and to UBER of the specific provisions of the California Labor Code alleged to have been violated,

including the facts and theories to support the alleged violations. No notice was provided by the LWDA regarding any intentions to investigate the alleged violations.

Plaintiffs will have satisfied the administrative prerequisites under California Labor Code section 2699.3(a) to recover civil penalties against Defendants, in addition to other remedies, for violations of California Labor Code §§ 201, 202, 203, 204, 226(a), 226.8, 510, 1194, 1197, 1198 and 1770-1773 et seq.

Pursuant to California Labor Code §§ 2699(a), 2699.3 and 2699.5, Plaintiffs and all other Aggrieved Employees are entitled to recover civil penalties against Defendants, in addition to other remedies, for violations of California Labor Code §§ 201, 202, 203, 204, 226(a), 226.8, 510, 1194, 1197, 1198 and 1770-1773 et seq.

Further, Plaintiffs are entitled to seek and recover reasonable attorneys' fees and costs pursuant to California Labor Code § 2699 and any other applicable statute.

**NINTH CAUSE OF ACTION**

**(Individual and Representative Claim for Injunctive Relief for Violation of California Labor Code § 2750.3 for Misclassification of Employees as Independent Contractors under the ABC Test)**

**(GLINOGA, GONZALEZ, and NEELY Against All Defendants)**

Plaintiffs and Class Members re-allege and incorporate by reference the foregoing allegations as though set forth herein.

Plaintiffs and Class Members allege that Labor Code § 2750.3 subdivision (a) states that "a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions [of the ABC Test] are satisfied:

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact. (B) The person performs work that is outside the usual course of the hiring entity's business. (C) The person is customarily engaged in an independently established trade, occupation, or

1  ~~business of the same nature as that involved in the work~~
2  ~~performed. (*Id.*)~~

~~Upon information and belief, during all times relevant to this action, Plaintiffs and Class Members, were willfully misclassified as independent contractors under Labor Code § 2750.3, and they suffered and continue to suffer damages from not being correctly classified as employees; including, but not limited to, failure to receive minimum wage, overtime pay and reimbursements.~~

~~Specifically, Plaintiffs GLINOGA, GONZALES, and NEELY have been driving for Defendants prior to March 1, 2020 continuing up to and until approximately March of 2020.  To date, Defendants have continued to willfully misclassify Plaintiffs GLINOGA, GONZALES, and NEELY as independent contractors and have failed to pay Plaintiffs GLINOGA, GONZALES, and NEELY minimum wage.~~

~~To date, Plaintiffs GLINOGA, GONZALES, and NEELY have not been reimbursed by Defendants for various work-related expenses.  During the entirety of their employment, Plaintiffs GLINOGA, GONZALES, and NEELY allege approximately $1,000 to $1,200 total spent per month, out of pocket on work-related expenditures, such as gas, car insurance, car washes and cleanings, vehicle repairs and maintenance, and cellular phone bills.~~

~~For Defendants' misconduct as alleged in this Complaint, Plaintiffs and Class Members seek damages, penalties, costs and attorneys' fees pursuant to the Labor Code.~~

~~For Defendants' violation of section 2750.3, Plaintiffs and Class Members seek injunctive and declaratory relief pursuant to subdivision (j), that Plaintiffs and all Class Members have been misclassified as independent contractors pursuant to section 2750.3's ABC test.~~

~~Non-Representative Plaintiffs will be enforcing any of their respective individual rights and remedies for Defendants' violation of Labor Code § 2750.3 through arbitration.~~

23                                  **<u>PRAYER</u>**

24        1.    For damages according to proof, including loss of earnings, deferred
25  compensation, and other employment benefits, and interest thereon;
26  //
27  ~~#~~
28

CLASS ACTION –SECOND AMENDED COMPLAINT FOR DAMAGES AGAINST UBER
46

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: -1.75" + Tab after:  -1.5" + Indent at:  -1.5"

1       2.     For interest provided by law including, but not limited to, Civil Code
2   § 3291;

3       3.     For general unpaid wages at overtime wage rates and such general and
4   special damages as may be appropriate;

5       4.     For statutory penalties pursuant to California Labor Code §226(e);

6       5.     For statutory wage penalties pursuant to California Labor Code §§
7   1770-1773;

8       6.     For restitution of unpaid wages to Plaintiff and prejudgment interest
9   from the day such amounts were due and payable;

10      7.     For reasonable attorneys' fees and costs of suit incurred herein
11   pursuant to California Code of Civil Procedure § 1021.5;

12      8.     For injunctive relief pursuant to California Labor Code § 2750.3,
13   subdivision (j), and Business & Professions Code § 17200, et seq.;

14      9.     For declaratory relief that UBER's ride share drivers, Plaintiffs and
15   Class Members herein, are not independent contractor, but employees, under the
16   *Dynamex* ABC Test;

17     10.    For civil penalties pursuant to California Labor Code § 2699(a) and/or
18   2699(f) and (g) in the amount of at least one hundred dollars ($100) for each
19   violation per pay period for the initial violation and two hundred dollars ($200) for
20   each aggrieved employee per pay period for each subsequent violation, plus costs
21   and attorneys' fees for violation of California Labor Code §§ 201, 202, 203, 204,
22   226(a), 226.8, 510, 1194, 1197, 1198 and 1770-1773 et seq.;

23     11.    For costs incurred by Plaintiff, including reasonable attorneys' fees
24   and costs of suit, in obtaining the benefits due to Plaintiffs and for violations of
25   Plaintiffs' civil rights as set forth above; and pursuant to the Labor Code §§ 218.5,
26   218.6, 226(e), 1194(a), 2699; and California Code of Civil Procedure section
27   1021.5; and

28   //

1    12.    For such other and further relief as the court deems just and proper.

2

3

4    Dated:  January 4, 2021January 4,
5    2021January 3, 2021January 1, 2021   WEST COAST TRIAL LAWYERS, APLC

6                                                      /s/
7                                          By: _____
8                                               Ronald L. Zambrano
                                                 Attorney for Plaintiffs and Class
9                                               Members, NICHOLAS JERICHO, et al.

10

11

12

13

14                          **DEMAND FOR JURY TRIAL**

15        Plaintiffs hereby respectfully demand a jury trial.

16

17

18   Dated:  January 4, 2021January 4,        WEST COAST EMPLOYMENT
     2021January 3, 2021January 1, 2021   LAWYERS, APLC
19

20                                                    /s/
21                                          By: _____
                                                Ronald L. Zambrano
22                                              Attorney for Plaintiffs and Class Members,
                                                NICHOLAS JERICHO, et al.
23

24

25

26

27

28

---

CLASS ACTION –SECOND AMENDED COMPLAINT FOR DAMAGES AGAINST UBER
48